# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MYRON R. MARTIN, | Case No.: 2:09-cv-002127-GMN-GWF |
| Plaintiff, | **AMENDED ORDER** |
| vs. | This **AMENDS** ECF 33, filed on 08/24/2011, as follows: On page 3, line 8, **at** Fed. R. Civ. P. 56(c)(2) n.[1], **"n.[1]"** has been amended as follows: "and when the Response and Reply was submitted and, therefore, would be the most apt language to apply" has been deleted. |
| PAPILLON AIRWAYS, INC. *d.b.a.* PAPILLON GRAND CANYON HELICOPTERS, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Defendant Papillon Airways, Inc. dba Papillon Grand Canyon Helicopters' (hereinafter "Defendant" or "Papillon") Motion for Summary Judgment (ECF No. 23). Plaintiff Myron R. Martin filed a Response on December 21, 2010 (ECF No. 26) and Defendant filed a Reply on January 14, 2011 (ECF No. 28).

## FACTS AND BACKGROUND

This dispute arises out of an alleged wrongful termination of Plaintiff Martin. On or about November 10, 2006, Martin was hired by defendant Papillon to act as their Procurement Manager. (Martin Decl. ¶3, ECF No. 26-4.) This incident that Martin alleges gave rise to his termination began in July of 2009. On July 2, 2009 Martin received an e-mail from Dean Brandt (Vice President of Operations, Chief Information Officer and General Manager for Papillon) asking him and Alan Martin (Maintenance Manager for Papillon) to order some windshields from Tech-Tool Plastics, Inc. ("Tech-Tool") for Eurocopter France ("Eurocopter"). (*Id.* at ¶10; Ex. C, ECF No. 26-5.) Tech-Tool and Eurocopter are two of Papillon's vendors. After reviewing the e-mails, Plaintiff discovered that the windshields were being ordered

without Tech-Tool's knowledge or consent that they would be sent to Eurocopter France. (Martin Aff. at ¶12; Ex. D, ECF No. 26-5.)  Martin believed that Eurocopter France was acquiring the windshields to study the design because Eurocopter was having issues with cracking. (*Id.*)  Martin determined that this was dishonest, deceitful, unethical and probably unlawful and decided to reveal this to Tech-Tool. (Martin Aff. at ¶¶13-14.)  Thus, when Martin placed the order he also sent to Grady Aldarondo at Tech-Tool the entire string of e-mails to fully disclose what was going on. (*Id.* at ¶14).  Martin received a phone call from Aldarondo shortly thereafter who explained that the owner of Tech-Tool was very mad and that the windshields would not be shipped. (*Id.* at ¶16.)

On July 6, Plaintiff e-mailed Brandt and Alan Martin telling them what he had done. (*Id.* ¶18; Ex. E; ECF No. 26-6.)  Sometime thereafter Martin was verbally assaulted by Brandt and was told he was being suspended without pay for one week while they decided what to do with him. (Martin Aff. at ¶22; Ex. F, ECF No. 26-6.)  On July 13, 2009 Martin was terminated. (Martin Aff. at ¶23, Ex. G, ECF No. 26-6.)

Defendant claims that Martin was terminated because he yelled and hung up on another customer, Tom Belew on July 1, 2009 and that Martin's conduct on that day was consistent with his past unprofessional conduct.  Defendant contends that this pattern of bad temperament was the reason for Martin's termination and had nothing to do with Martin disclosing to Tech-Tool that they were ordering windshields for Eurocopter.

Plaintiff filed suit in District Court of Nevada, Clark County on May 28, 2009 and Defendant removed the case to the Federal District Court of Nevada. (Notice of Removal ¶1, ECF No. 1.)  Plaintiff alleged four causes of action: (1) tortuous discharge in violation of public policy, (2) breach of implied-in-fact contract, (3) breach of the covenant of good faith and fair dealing, and (4) intentional infliction of emotional distress. (Complaint, ECF No. 1.)  The parties stipulated to dismiss the second and third causes of action. (ECF No. 21.)  Defendant

1 filed the instant motion for summary judgment seeking judgment in its favor for counts one and
2 four.

### DISCUSSION

**A.   Legal Standard**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[1] Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

---

[1] Federal Rule of Civil Procedure 56 was recently amended, effective December 1, 2010. *See* Fed. R. Civ. P. 56 Advisory Committee Notes, 2010 Amendments. The standard for granting summary judgment remains the same. *Id.* Amendments to the Federal Rules of Civil Procedure govern proceedings that are pending at the time the amendments become effective, as long as the Supreme Court does not specify otherwise and the application would not be infeasible or work an injustice. Fed. R. Civ. P. 86(a)(2). Here, to prevent against any injustice to the parties, the Court will apply the language of Rule 56 that was in use prior to the new December 1, 2010 amendments. This earlier language was the language that was applicable when the Motion for Summary Judgment was filed.

*Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

B.     **Tortuous Discharge**

Under Nevada law, to prevail on a tortuous discharge claim "the employee must be able to establish that the dismissal was based upon the employee's refusing to engage in conduct that was violative of public policy or upon the employee's engaging in conduct which public policy favors." *Bigelow v. Bullard*, 111 Nev. 1178, 901 P.2d 630, 632 (1995). It is against public policy to terminate an employee that refuses to engage in conduct that he, in good faith, reasonably believed to be illegal. *See Allum v. Valley Bank of Nevada*, 970 P.2d 1062 (1998). The whole premise of this section relies on the assumption that Plaintiff in good faith thought that by not revealing certain information about the order to Tech-Tool, he and his company would be engaging in some illegal activity. Defendant vehemently argues that there was no violation of public policy because it is not illegal to buy items on the open market for someone else. However, Tech-Tool's reaction supports Plaintiff's position.

To establish a tortuous discharge for refusing to partake in conduct violative of public policy in Nevada, it is clear that an employee *must refuse* to follow his or her employer's instruction to perform an unlawful act. For example, in *Western States v. Jones*, 107 Nev. 704 (1991) an employee refused to follow his employer's request to work in an unsafe work environment and he was terminated as a result. The Court held that the employer's conduct violated Nevada public policy and found that a tortuous discharge claim will be permitted if the discharge is based on the employee's refusal to comply with an employer's demand that the employee engage in improper activity. *Id.* at 718. However, in *Bigelow v. Bullard*, 111 Nev. 1178 (Nev. 1995), where two plaintiffs brought a wrongful termination claim after they were terminated for objecting to the employer's discriminatory practices the *Bigelow* court explained that only when an employee refused to engage in an employer's demand to engage in an improper activity will a cause of action for a tortuous discharge lie. *Id.* at 1186.

Defendant argues that Martin never refused to engage in conduct he believed was illegal. In fact, Plaintiff was told to order the windshields and Martin admits that he ordered said windshields. However, Martin argues that the improper act that he refused to engage in was the concealment. The requested conduct required him to keep secret from Tech-Tool that his employer was actually ordering the windshields for Eurocopter.

Defendant compares Martin's conduct to the conduct of an employee in *Bielser v. Professional Systems Corp.*, 321 F.Supp.2d 1165 (D.C. Nev. 2004). In *Bielser* the plaintiff alleged that she was terminated for pointing out fraudulent and potentially illegal activities on the part of the company to management. The court distinguished between cases in which an employee is asked by his employer to participate in conduct violative of public policy (refusal case) and those in which the employee merely discovers that his employer is engaged in illegal conduct and reports it to someone (whistleblower case). The plaintiff in *Bielser* did not refuse to engage in activity that would violate Nevada public policy because she merely pointed out what could be potentially illegal activities but still did the activity. Defendant argues that in a similar manner Martin did not refuse to engage in activity that he thought was illegal because he still ordered the windshield. Like the plaintiff in *Bielser*, Martin pointed out to his supervisors, days after he ordered the windshields, that he thought the conduct was wrong.

The court in *Bielser* also found that the plaintiff established a whistleblowing type of claim because an employee is entitled to protection if the employee exposes his employer's illegal activity to an appropriate outside, external agency and not internally to a supervisor. *Id.* at 1171; *See also Wiltsie v. Baby Grand Corp.*, 774 P.2d 432 (Nev. 1989). In contrast, the Plaintiff in the case before the court (Martin) did not report the concealment conduct that he thought was illegal to an external agency. He merely told his supervisors and Tech-Tool. Therefore, the court finds that reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict finding Martin did refuse to engage in an activity that

was against public policy. The conduct was not just a refusal to order the windshields because there is no question that plaintiff did order the windshields. The conduct was the concealment; keeping secret from Tech-Tool the fact that Papillon was ordering the windshields for Eurocopter.

It is also from this conduct that the jury could infer that Martin did in essence refuse to place the windshield order, because after the concealment was disclosed to Tech-Tool, the order placed was never fulfilled or cancelled. In Martin's declaration he states that "[f]rom the time I got the e-mail from Dean Brant to order the windshields, Alan Martin came to my office first making sure I was ordering the windshields and that I didn't tell Tech-Tool that the windshields were being ordered for Eurocopter France . . .." (Martin Decl. at ¶17.) The e-mail chain between Dean Brandt and Jean-Michel Arlhac (Eurocopter) clearly states not to tell Tech-Tool who the windshields are for. (*See* Ex. D, ECF No. 26-6.) Perhaps most importantly, the e-mail chain also reveals that Tech-Tool had in the past specifically refused to sell the windshields to Eurocopter. (*Id.*) Thus, Defendant's argument that it was only engaging in legal conduct by ordering items on the open market is not very persuasive.

**C.     Mixed Motive**

The Nevada Supreme Court has explicitly rejected the contention that a wrongful termination claim can be supported by a "mixed motive" theory. *Allum v. Valley Bank*, 970 P.2d 1062 (1998). A mixed motive theory is one where an employee can recover upon a showing that the adverse employment decision resulted from a mixture of legitimate reasons and prohibited motives. *Id.* at 1065. "[T]hus, a plaintiff must demonstrate that his protected conduct was *the* proximate cause of his discharge." *Id.* at 1066.

Defendant argues that they have provided evidence to show that they had a legitimate reason to fire Martin. Defendant claims that they terminated Martin's employment for the July 1, 2009 incident where Plaintiff hung up and yelled at a vendor. (*See* Ex. J, M and N, ECF No.

23-4.) Martin had been involved in similar incidents and his attitude and temperament were an ongoing problem. (*See* Ex. F &G, ECF No. 23-2.)  Further, Plaintiff admitted that Papillon could have terminated his employment based on the July 1, 2009 incident. (Martin Dep. 137:5-10, ECF No. 26-5.)

However, Plaintiff argues that the actual proximate cause for his termination was his disclosure to Tech-Tool and eventual admission to his employers on July 6, 2009.  First, Plaintiff was immediately suspended when he told his supervisors that he disclosed the information to Tech-Tool. (Martin Aff. at ¶22; Ex. F, ECF No. 26-6.)  Second, Dean Brandt sent an e-mail to Papillon employees on July 8, 2009 that stated "[s]o what do we do with an idiot like this f*!khead Russ Martin that works for us? I was trying to help Eurocopter guess I should not have included this moron on the E-mails. I want to fire his a$$ two ways to Sunday." (*See* Ex. G, ECF No. 26-11) (*redactions added by court*).

After considering all evidence in a light most favorable to the Plaintiff and drawing all inferences in his favor the Court finds there is a genuine issue of material fact that the proximate cause for Martin's termination from employment was based on his actions in telling Tech-Tool about the windshields.  Defendant has offered sufficient evidence to show that they had a legitimate reason to fire Martin.  But that alone is not enough.  If Plaintiff can demonstrate that his protected conduct was *the* proximate cause, it does not matter that Defendant may have other reasons to also fire Plaintiff.  In that instance any reason proffered may only be pretext.  Martin has provided sufficient evidence for which a reasonable trier of fact could conclude that the sole reason Plaintiff was fired was for revealing to Tech-Tool the true destination of the windshields and not a mixed combination of said conduct and previous bad temper or other unprofessional acts.

### D.  Intentional Infliction of Emotional Distress (IIED)

In Nevada, to prevail on a claim for intentional infliction of emotional distress (IIED), a

plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation." *Miller v. Jones*, 970 P.2d 571 (Nev. 1998).

"[E]xtreme and outrageous conduct is that which is 'outside all possible bounds of decency' and is regarded as 'utterly intolerable in a civilized community.'" *Maduike v. Agency Rent-A-Car*, 953 P.2d 24 (Nev. 1998) (citing BAJI 12.74).  Plaintiff argues that Papillon's conduct was extreme and outrageous because Papillon asked Plaintiff to conspire to arguably steal trade secrets of Tech-Tool for which he could have received a fine and imprisonment of up to 10 years under federal or state law.  Plaintiff also argues that he was given the choice between going along with the conspiracy or face termination. (Response, 17:8-10, ECF No. 26-1.)

However, this argument contradicts the facts in the record and Plaintiff's prior arguments.  Plaintiff alleges that he was asked to order the windshields from Tech-Tool via an e-mail.  When Plaintiff inspected the string of e-mails he thought there might be something illegal going on so he told Tech-Tool that he was buying the windshields for Eurocopter.  Only after he revealed to Tech-Tool the actual intent of his employer regarding this transaction did Plaintiff then inform his supervisors what he did.  There was never an ultimatum given to Plaintiff that if he did not engage in conduct that was illegal[2] he would be fired.  Ultimately, Plaintiff's conduct may have been the proximate cause of his termination, but termination alone does not give rise to a claim for IIED.

The termination of an employee, even if the termination was in violation of Nevada public policy does not in itself amount to extreme and outrageous conduct actionable under an

---

[2] The Court is not concluding that Defendant's conduct was illegal.  The Court is only establishing that even if the allegations are true and the conduct was indeed illegal Plaintiff has not demonstrated extreme and outrageous conduct.

intentional infliction of emotional distress theory. *See Hirschhorn v. Sizzler Restaurants Intern., Inc.*, 913 F.Supp. 1393 (D.Nev. 1995). "Liability is only found in extreme cases where actions of the defendants go beyond all possible bounds of decency, is atrocious and utterly intolerable." *Id.* at 1401 (citing *Alam*, 819 F.Supp. 905, 911 (D.Nev. 1993)). Plaintiff has simply failed to demonstrate such conduct was outrageous especially when he was unaware that disclosing the information to Tech-Tool would result in his termination. Plaintiff was never threatened that he must engage in conduct that he thought was illegal or face disciplinary actions or termination.

In addition, Plaintiff does not demonstrate, or offer any evidence to show that Defendant's conduct was intentional or with reckless disregard. A mere conclusory statement in the Response that Defendant's conduct "at lease showed reckless disregard for the probability of causing emotional distress to Plaintiff" does not create a genuine issue of material fact.

Considering all evidence in a light most favorable to the Plaintiff and drawing all inferences in his favor the Court finds there are no genuine issues of material fact that Defendant's conduct was so extreme and outrageous or that Defendant acted with intent or reckless disregard to satisfy the first and second elements of a claim for IIED. Accordingly, Defendant's motion for summary judgment on Plaintiff's Fourth Cause of Action for Fourth Cause of Action is GRANTED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendant Papillon Airways, Inc. dba Papillon Grand Canyon Helicopters' (hereinafter "Defendant" or "Papillon") Motion for Summary Judgment (ECF No. 23) is **DENIED in part** and **GRANTED in part**.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment is **DENIED as to Plaintiff's claim of tortuous discharge in violation of public policy**.

1     **IT IS FURTHER ORDERED** that Defendant is GRANTED judgment in its favor for Plaintiff's Fourth Cause of Action for Intentional Infliction of Emotional Distress.

    **DATED** this 1st day of February, 2012.

    **NUNC PRO TUNC DATE:** August 24, 2011.

_____
Gloria M. Navarro
United States District Judge